**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Roadget Business Pte. Ltd., | |
| *Plaintiff*, | |
| v. | No. 24 CV 607 |
| The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto, | Judge Lindsay C. Jenkins |
| *Defendants*. | |

**ORDER**

Before the Court is Defendants' motion to modify the temporary restraining order ("TRO"). [Dkt. 42; *see id.* at 1 n.1 (listing Defendants who join the motion).] Defendants ask the Court to reduce the amount of the asset freeze from all assets in Defendants' Temu accounts to the amount of revenue generated by sales of the allegedly infringing products. [*See* Dkt. 45 at 1–2.] In support, Defendants provide a declaration from Temu's senior counsel and spreadsheets documenting the amount of revenue associated with the "Good ID" of each allegedly infringing product. [*See* Dkt. 45-1, 45-2.] According to Temu's counsel, there was a total of $421,823.40 frozen across Defendants' accounts as of March 10, 2024, but the revenue attributable to the challenged products is only $176,408.50. [*See* Dkt. 45 at 1–2; Dkt. 45-1, 45-2.][1] Defendants ask the Court to reduce the amount of the asset freeze accordingly. Over Plaintiff's objections [Dkt. 58, 71], the motion to modify the TRO is granted.

Defendants argue that the Court can only freeze assets in furtherance of an equitable remedy—here, an accounting of profits—not an award of actual or statutory damages. [*Id.* at 2–3.] "[D]istrict courts generally do *not* have the authority to preliminarily restrain assets where a plaintiff seeks a money judgment." *Deckers Outdoor Corp. v. Schedule A*, 2013 WL 12314399, at *2 (N.D. Ill. Oct. 31, 2013) (citing *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 331 (1999)). "[T]here is an exception to the general ban on prejudgment asset restraint where an equitable remedy is sought," such as "an accounting of profits (that is, disgorgement of profits) under 15 U.S.C. § 1117(a)." *Id.* (citing *Grupo Mexicano*, 527 U.S. at 325). "But an accounting of profits is not automatically awarded in lieu of actual damages, and even where equitable relief is sought, the appropriate scope of prejudgment restraint must be limited only to what is reasonably necessary to secure the (future)

---

[1]     The amount of frozen assets appears to be rising. [Dkt. 68 at 2–3; Dkt. 68-1, 68-2.]

equitable relief." *Id.* (citation omitted). Because Defendants' profits from the allegedly infringing products are not yet known, they ask the asset freeze be reduced to the total revenue generated from selling the challenged products. [Dkt. 45 at 3–4.] Profit inherently cannot exceed revenue, so Defendants are correct that "a reduction of the freeze to revenues on accused sales is more than sufficient, and would preserve all assets arguably subject to a future equitable accounting." [*Id.* at 3.]

Plaintiff does not seem to dispute that the most it can recover in equity is the amount by which Defendants profited from sales of infringing products or that the Court can freeze only that amount. [*See* Dkt. 58 at 2–3.] Instead, Plaintiff argues that "when disgorgement is sought and the amount of profit is unknown, … courts have found it appropriate to freeze *all* assets at issue," and that Defendants here have not produced sufficient evidence to establish that a reduction is appropriate. [*Id.* (citation omitted).] Regarding the scope of the asset freeze, the cases Plaintiff cites [*see id.* at 2–3] are distinguishable. In *Banister v. Firestone*, the defendant made no objection to a preliminary injunction that froze his assets, nor did he try to "obtain an exception from the asset freeze" by "present[ing] 'documentary proof' that the bank account at issue did not contain any proceeds from infringing activities"; instead, he "argue[d] generally that th[e] Court lack[ed] legal authority to restrain his bank account." 2018 WL 4224444, at *7–9 (N.D. Ill. Sept. 5, 2018) (citations omitted). The other cases involved *ex parte* asset freezes, which by definition occurred before the defendants could appear to contest them. *Chrome Cherry Ltd. v. Schedule A*, 2021 WL 6752296 (N.D. Ill. Oct. 20, 2021); *Deckers*, 2013 WL 12314399.[2] Here, Defendants have objected to the asset freeze at their earliest opportunity and have submitted documentation to support their position.[3] The Court sees no reason not to consider the question of the scope of the asset freeze. *Cf. Chrome Cherry*, 2021 WL 6752296, at *2 ("The Court … finds that the requested temporary asset restraint is warranted at this juncture. … [S]hould a defendant appear and object to the asset freeze, the Court will revisit the issue."); *Deckers*, 2013 WL 12314399, at *2 ("To the extent that the restraint might be too broad, the defendants may file challenges to the scope of the TRO by submitting evidence that some or all of the money has other sources.").

---

[2]      Plaintiff states that in *Deckers*, the court "rejected the defendants' request to narrow the temporary restraining order and froze all defendant assets." [Dkt. 58 at 2–3.] But in *Deckers*, the court granted an *ex parte* TRO and ultimately entered default judgment because no defendant appeared. *See generally* 13-cv-7621 (N.D. Ill.).

[3]      The Court disagrees with Plaintiff's assertion that Defendants have "already been heard" on the TRO because their now-counsel acted as *amicus curiae* and raised concerns about entering the TRO. [*See* Dkt. 58 at 1.] Defendants' identities were still under seal, so *amicus* could not have raised the specific arguments Defendants now do. Besides, even if their current arguments were entirely duplicative of their counsel's earlier arguments as *amicus*, Defendants would have a due process right to make those arguments. *Cf. Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 705–13 (7th Cir. 2024) (discussing when binding a party to another's prior litigation position is consistent with due process).

Plaintiff next argues that "Defendants are not entitled to a reduction in the asset freeze until they prove the amount of frozen assets that did not result from infringing conduct." [Dkt. 58 at 3 (citing cases in which courts required the defendant to submit evidence before modifying a TRO).] Defendants have supplied evidence—the declaration of Temu's counsel and accompanying spreadsheets—but Plaintiff argues that it is not sufficiently reliable. [*Id.* at 4.] Plaintiff states:

> The Declaration … provides some explanation as to how the Temu data was gathered, but without more information from the Defendants themselves, it raises more questions than answers. For example, the Declaration states that revenue was determined by reference to "Good ID" numbers, which are listed on the Temu data spreadsheet. However, there is no proof that these Good ID numbers are the only ones under which the Defendants sold infringing goods. It is plausible, perhaps even likely, that the Defendants have listed infringing products under more than one Good ID, or listed an infringing product under one Good ID only to take the listing down and relist it later under a different Good ID. Without more details about how this system works or documentary evidence from the Defendants, there is no way to adequately judge the reliability of the data. The Defendants tellingly produced no records of their own to verify revenue data, and their declarations provide no detailed explanation of their revenue beyond the Temu data.

[*Id.* (citations omitted).] Plaintiff notes that it has not had the opportunity to take discovery regarding the reliability of the Temu data, and it raises the specter of "the possibility of coordination between Temu and Defendants." [*Id.* at 5.][4]

The Court disagrees that the possibility that Defendants' infringement goes beyond the products that are the subject of Plaintiff's Complaint and the TRO is a reason to maintain the asset freeze. As Defendants argue, "Plaintiff defined the scope of the accused products in its Complaint; the Good IDs about which Plaintiff now makes much noise come directly from the URLs listed as the accused 'Product Link(s)' in its Complaint and were included in Temu's data production." [Dkt. 68 at 3 (citation omitted).] Plaintiff has not identified additional infringing products on Defendants' storefronts, so only these products are relevant to the asset freeze at this time. Although to reduce the asset freeze, Defendants must show that frozen funds are not attributable to infringement, Plaintiffs cannot rebut Defendants' evidence by stating, without evidence of its own, that there might be more infringement. Plaintiff received

---

[4]     Plaintiff also rightly explains that the evidence is insufficient to establish Defendants' profits from the allegedly infringing products. [Dkt. 58 at 5.] But Defendants are not seeking to reduce the asset freeze based on their profits [*see* Dkt. 68 at 3]; as the Court explained above, reducing the asset freeze to the amount of revenue protects Plaintiff's interest in the funds it can recover through an equitable remedy. Therefore, the Court also does not discuss the declarations from individual Defendants—the Court would not reduce the amount of the asset freeze based on an untested, one-sided account of a party.

3

the TRO only after making a clear showing of infringement; the Court will not expand its effective scope without a clear showing of additional infringement.

Plaintiff's concerns about possible coordination between Temu and Defendants are well taken, but it would be too burdensome to implement Plaintiff's proposed solution at this stage. Plaintiff seeks to take a nontrivial amount of discovery while the full asset freeze remains in place and continues to grow. [Dkt. 71.] Although a full asset freeze was appropriate at the outset of the litigation, the available evidence indicates that the asset freeze is overbroad. Defendants have proposed a reduction that appears likely to be sufficient to protect Plaintiff's interest in an equitable remedy. Moreover, if Temu has provided inaccurate or knowingly false information, Plaintiff may be able to bring claims against the platform itself. A full evidentiary record and the complete scope of Plaintiff's claims can be developed during discovery. In the meantime, the Court finds that Defendants have provided sufficient evidence that a reduction in the amount of the asset freeze is warranted, despite Plaintiff's concerns about the reliability of the Temu data.

## CONCLUSION

For the foregoing reasons, Defendants' motion to modify the TRO [Dkt. 42] is granted. The asset freeze will be reduced to the total amount of revenue generated from the allegedly infringing products as reflected in the Temu data, for a total of $176,408.50 across the relevant Defendants. [Dkt. 45-1, 45-2, 68-1, 68-2.] By tomorrow, April 17, 2024, the parties shall submit to the Court's proposed order inbox a modified TRO consistent with this Order.

Enter: 24-cv-607
Date: April 16, 2024

_____
Lindsay C. Jenkins
United States District Judge